IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| CURTIS HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 314-035 |
| | ) | |
| CORRECTIONS CORPORATION OF | ) | |
| AMERICA; JASON MEDLIN; RON DAY; | ) | |
| JAY PHILLIPS; and DAMON HININGER, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**O R D E R**
_____

On August 15, 2017, the Court held a bench trial concerning Plaintiff's claims that Defendants' operation of a religious program at Wheeler Correctional Facility ("WCF") violated the Establishment Clause of the United States Constitution, U.S. Const. Amend. I, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court makes its findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

Plaintiff Curtis Hunter is a prisoner in custody of the Georgia Department of Corrections. From April 15, 2014 through November 7, 2014, Plaintiff was assigned to Unit 9N of WCF, a private prison operated by Defendant Corrections Corporation of America ("CCA"). During this time period, Defendant Damon Hininger was President of CCA, Defendant Jason Medlin was warden of WCF, Defendant Ron Day was chaplain of WCF,

and Defendant Jay Phillips was a facilitator assigned to WCF's Life Principles Program ("the Program"), which was housed in Unit 9N.

Upon arrival at WCF, Plaintiff was initially assigned to a top bunk because his bottom bunk profile expired before his transfer. While being processed through qualifications, Plaintiff expressed his difficulty in finding a bottom bunk. A WCF employee told Plaintiff there was a bottom bunk in Unit 9N, where the Program was housed, and he could stay there until renewal of his bottom bunk profile. The employee told him the majority of the Program utilized biblical and Christian materials, but also included Islam, Plaintiff's religion. Plaintiff decided to join the Program because (1) it offered his religion; (2) he had the opportunity to learn about other religions; and (3) a bottom bunk was available.

The Program in full lasted nine months, and consisted of three daily sessions. The first daily session involved memorization of Romans 1 and 2, viewing gospel videos by Bill Gaither, and reviewing Psalms and Proverbs with open discussion. During the second daily session, guest speakers lectured on the Bible. The third session involved Christian devotions and testimonies. On Fridays, the first session involved Christian worship and praise songs rather than the usual gospel videos and scripture memorization. Books utilized in the Program included "Commands of Christ" and "Power to True Success." The Program also involved anger resolution seminar videos. Program materials were biblical or Christian in nature.

Participation in the Program was voluntary, and an inmate could leave the Program at any time. While participation was voluntary, once enrolled in the Program, group sessions

were mandatory because it was an inmate's OMS assignment, or job assignment, within WCF. Failure to attend a group session would result in prison officials issuing a disciplinary report ("DR"). None of the group sessions interfered with Plaintiff's ability to regularly read the Quran, pray, or attend WCF's Jumu'ah service for Muslims on Friday afternoons.

The Program was staffed primarily by volunteers. However, Defendant Phillips was on staff at WCF and specifically assigned to oversee Unit 9N, which housed the Program. Defendant Phillips regularly visited the Program during Plaintiff's time, and was responsible for making sure every participant attended the first group session. Plaintiff testified Chaplain Day never visited the Program, and all witnesses testified Defendant Hinninger and Defendant Medlin never visited the Program. All funds for the Program came from the inmate benefit fund, which is derived from commissary sales and inmate telephone fees.

Plaintiff never filed a grievance about the Program or received a DR during his seven months in the Program. Only after Plaintiff left the Program did he file a grievance and this lawsuit. Plaintiff was the first inmate to complain about the Program. In response to Plaintiff's complaints, WCF discontinued the Program and replaced it with the Bureau of Prisons ("BOP") life skills program.

## II. CONCLUSIONS OF LAW

### A. The Program Violated the Establishment Clause Because Its Primary Effect Was Inculcation and Indoctrination of Christian Beliefs.

#### 1. The Establishment Clause Standard

The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. This restriction applies

to states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment. Holloman v. Harland, 370 F.3d 1252, 1284 (11th Cir. 2004). The Establishment Clause erects a barrier between government and religious entities "'depending on all the circumstances of a particular relationship.'" Lynch v. Donnelly, 465 U.S. 668, 678-79 (1984), (quoting Lemon v. Kurtzman, 403 U.S. 602, 614 (1971)); see McCreary Cty. v. Am. Civ. Liberties Union, 545 U.S. 844, 867 (2005) ("[U]nder the Establishment Clause detail is key."). For those "who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970).

The Establishment Clause applies only to state actors, which includes state and federal governments as well as a limited class of private entities. "Where a function which is traditionally the exclusive prerogative of the state . . . is performed by a private entity, state action is present." Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citations omitted). For example, private medical providers treating state inmates are liable under 42 U.S.C. § 1983 for deliberate indifference to medical needs because their treatment constitutes state action. See id.; Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997) ("When a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state."). Section 1983 also applies to the "'acts and decisions of individual government actors.'" Brunskill v. Boyd, 141 F. App'x 771, 775 (11th Cir. 2005) (quoting Holloman ex rel. Holloman v.

Harland, 370 F.3d 1252, 1284 (11th Cir. 2004)). This Court previously found, despite the lack of direct government funding, Defendants engaged in state action in implementing the Program. (Doc. no. 142-1, pp. 4-6.) The Court hereby reaffirms this finding.

The Supreme Court has not considered the Establishment Clause within the context of a prison. However, in an unpublished case, the Eleventh Circuit applied the Lemon-Agostini test to a faith-based dormitory program inside a prison. Smith v. Governor for Alabama, 562 F. App'x 806, 816 (11th Cir. 2014). The Eleventh Circuit has consistently applied the Lemon test outside of cases involving legislative prayer. Compare King v. Richmond Cty., Ga., 331 F.3d 1271, 1276 (11th Cir. 2003) (applying Lemon test to court seal containing ten commandments) and Holloman, 370 F.3d at 1284 (applying Lemon test to teacher's moment of silence) with Pelphrey v. Cobb Cty., Ga., 547 F.3d 1263, 1276 (11th Cir. 2008) (applying Marsh to prayer by county commission). Thus, the Court will apply Lemon, as modified in Agostini v. Felton, 521 U.S. 203, 211 (1997), to Plaintiff's claims that the Life Principles Program violates the Establishment Clause.

In Lemon, 403 U.S. at 602, the Supreme Court established a three-prong test for assessing the permissibility of a government program under the Establishment Clause: (1) the program "must have a secular . . . purpose;" (2) the program's "principal or primary effect must be one that neither advances nor inhibits religion;" and (3) the program "must not foster an excessive government entanglement with religion." Id. at 612-13. The Supreme Court refined the test in Agostini, however, stating, "[T]he factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect.' . . . [I]t is

5

simplest to recognize why entanglement is significant and treat it . . . as an aspect of the inquiry into a [program]'s effect." 521 U.S. at 233. "Thus, while the Court has folded its traditional 'excessive entanglement' inquiry into its 'primary effect' analysis, the substance of its Establishment Clause jurisprudence remains fundamentally unaltered." Holloman, 370 F.3d at 1285 (citing Zelman v. Simmons–Harris, 536 U.S. 639, 648-49 (2002)).

### 2. The Program Fails the Lemon Test.

Defendants claim the Program has the secular purpose of promoting inmates' self-improvement and good conduct. However, "[e]ven if the avowed objective . . . is not itself strictly religious, it is sought to be achieved through the observance of an intrinsically religious practice . . . . [T]he state cannot employ a religious means to serve otherwise legitimate secular interests." Id. at 1286 (internal quotations omitted). Moreover, as the Supreme Court recognized, "government inculcation of religious beliefs has the impermissible effect of advancing religion." Agostini, 521 U.S. 223. Stated differently, the primary effect inquiry asks "whether any religious indoctrination that occurs in [a government program] could reasonably be attributed to governmental action." Mitchell v. Helms, 530 U.S. 793, 809 (2000).

Here, the Program was intrinsically religious and had the primary effect of advancing and fostering an excessive entanglement with Christianity. The Program involved scripture memorization, prayer, and Christian praise and worship. The Program materials were Christian in nature, including the Bible and a book entitled "Commands of Christ." Even if the Program had ostensibly secular purposes, its "intrinsically religious" nature rendered it an

6

impermissible means to serve that secular end.

In addition, the Program was full of religious inculcation and indoctrination, and was the only life skills program offered at WCF. Contra Smith, 562 F. App'x at 816 (honor dorm's primary effect was not to advance or prohibit religion where it contained spiritual education as "only one of 20 suggested areas of programming, all of which were secular"). Christian indoctrination could be reasonably attributed to Defendants based on the Program's materials and activities. That the Program received no direct funding from the State of Georgia does not change this outcome. See Coronel v. Walker, No. 2:05CV-120-WAP-JAD, 2006 WL 2923152, at *9 (N.D. Miss. Sept. 14, 2006), report and recommendation adopted, No. 2:05CV120-P-D, 2006 WL 2855027 (N.D. Miss. Oct. 3, 2006) ("It seems clear that just as the state may not constitutionally 'establish' a religion directly in its prisons, it may not do so indirectly by the use of privately contracted prisons . . . . CCA must conduct itself within the confines of the Establishment Clause.").

Because the Program violated Plaintiff's rights under the Establishment Clause, the role of each Defendant in implementing the Program must be evaluated to determine which, if any, Defendants were responsible for the violation.

### 3. Defendants CCA and Phillips Participated in the Establishment Clause Violation, but Defendants Day, Medlin, and Hininger Did Not.

#### a. CCA Is Directly Responsible for the Violation.

As a state actor engaging in a public function, CCA is responsible for ensuring its vocational and life skills programs do not violate the Establishment Clause. See (doc. no.

142-1, pp. 5-6); Coronel, 2006 WL 2923152, at *9 ("CCA must conduct itself within the confines of the Establishment Clause."). Here, by implementing and continuing the Program, it failed to do so. Accordingly, Defendant CCA is responsible for the Program's Establishment Clause violations.

### b. Defendant Phillips Directly Participated in the Violation.

Defendant Phillips actively participated in implementing the Program. In addition to being the facilitator assigned to overseeing Unit 9N, Defendant Phillips regularly visited the Program. Because he oversaw the Program throughout Plaintiff's time, he is responsible for the Program's Establishment Clause violations.

### c. Chaplain Day Had No Connection to the Program.

Although Plaintiff alleges Chaplain Day had a contractual duty to monitor the Program, there is no evidence of such a duty. Nor does the evidence show Chaplain Day participated in developing, implementing, or operating the Program. Accordingly, Chaplain Day is not responsible for the Program's Establishment Clause violations.

### d. Defendants Medlin and Hinninger Cannot Be Held Supervisorily Liable for the Violation.

Because neither Defendant Medlin nor Defendant Hinninger actively monitored or participated in the day-to-day operation of the Program, they can only be held supervisorily liable based on their positions as Warden of WCF and CEO of CCA respectively. "Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); see

also Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003). "Because vicarious liability is inapplicable to § 1983 actions, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Rosa v. Fla. Dep't of Corr., 522 F. App'x 710, 714 (11th Cir. 2013) (quoting Iqbal, 556 U.S. at 676) (internal quotations omitted). Therefore, to hold a supervisor liable, Plaintiff must demonstrate that either (1) he actually participated in the alleged constitutional violation, or (2) there is a causal connection between his actions and the alleged constitutional violation. See Hartley, 193 F.3d at 1269 (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)).

The "causal connection" can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," Brown, 906 F.2d at 671, or when "the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" Hartley, 193 F.3d at 1269 (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)). The standard for demonstrating "widespread abuse" is high. In the Eleventh Circuit, "deprivations that constitute widespread abuse sufficient to notify the supervising official must be *obvious, flagrant, rampant and of continued duration*, rather than isolated occurrences." Brown, 906 F.2d at 671 (emphasis added). A causal connection may also be shown when the facts support "an inference that the supervisor [or employer] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Here, neither Defendant Medlin nor Defendant Hinninger can be held supervisorily liable. Defendant Medlin testified he had no direct supervision over the Program or Defendant Phillips. Furthermore, he had no personal knowledge of the Establishment Clause problems with the Program, and he had already left his position as warden of WCF when Plaintiff complained. Plaintiff was the first inmate to complain about the Program, and in response officials at WCF abolished the Program and replaced it with the BOP life skills program. Moreover, there is no evidence of any notice to Defendant Medlin of widespread abuse or a custom or policy of violating the Establishment Clause. Accordingly, Defendant Medlin is not liable for the Program's Establishment Clause violations.

Defendant Hinninger had no connection to the Program other than his supervisory position as CEO of CCA. All witnesses testified Defendant Hinninger never visited the Program. Nor did he have any part in implementing the Program. Indeed, there is no reason for the CEO of a large, nationwide private prison corporation to have an active role in implementing and reviewing life skills programs on a prison-by-prison basis. Moreover, Establishment Clause violations by one life skills program at one CCA facility does not constitute the "history of widespread abuse" required to make out the required causal connection. Accordingly, Defendant Hinninger is not liable for the Program's Establishment Clause violations.

**B.     RLUIPA Violation**

42 U.S.C. 2000cc-1 provides the following:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of

> this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

To establish a prima facie case under section 3 of RLUIPA, a plaintiff must demonstrate (1) he engaged in a religious exercise; and (2) the religious exercise was substantially burdened. Smith v. Allen, 502 F.3d 1255, 1276 (11th Cir. 2007) abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277 (2011). If a plaintiff makes such a showing, the government must then demonstrate that imposition of the burden or refusal to accommodate a plaintiff's belief furthers a compelling government interest by the least restrictive means. 42 U.S.C. § 2000cc–1(a); 42 U.S.C. § 2000cc–2(b). "[I]f the plaintiff fails to present evidence to support a prima facie case under RLUIPA, the court need not inquire into whether the governmental interest at stake was compelling." Smith, 502 F.3d at 1276; see also Benning v. Georgia, 845 F. Supp. 2d 1372, 1376-77 (M.D. Ga. 2012). RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7).

Here, Plaintiff's religious beliefs were not substantially burdened because the Program did not interfere with Plaintiff's ability to practice Islam. Throughout his time in the Program, Plaintiff was able to regularly read the Quran, pray, and attend Jumu'ah services. None of Defendants' actions interfered with Plaintiff's ability to practice his religion freely.

11

Non-interference with Plaintiff's personal religious practice, however, does not alone absolve Defendants. Being forced to engage in conduct that violates one's religious beliefs constitutes a substantial burden under RLUIPA. See Holt v. Hobbs, 135 S. Ct. 853, 862 (2015) (finding policy that coerced Muslim prisoner into shaving beard through disciplinary report imposed substantial burden). Here, however, Plaintiff's participation in the Program was completely voluntary. Plaintiff was offered placement in the Program as a way to get a bottom bunk while his profile was being renewed, and he agreed to enter the program in order to obtain this benefit. Plaintiff further testified he joined the Program to learn about other religions. While in the Program, he never received a disciplinary report, nor did he complain about the Program's Christian content. He could have left the Program at any time without penalty, but again, voluntarily chose not to do so. Indeed, it was not until after he completed the Program that he began to complain he was forced to participate in it. Because he could have left the Program at any time without penalty, his religious practice was not substantially burdened.

Accordingly, because he was a voluntary participant in the Program, Plaintiff's rights under RLUIPA were not violated.

### C. Plaintiff Can Only Recover Nominal Damages.

Throughout the course of litigation, Plaintiff has argued he is entitled to compensatory and punitive damages for his claim. However, 42 U.S.C. § 1997e(e) provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

The Eleventh Circuit has applied 42 U.S.C. § 1997e to First Amendment and RLUIPA claims and held it precludes recovery of compensatory and punitive damages. See Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277 (2011); see also (doc. no. 108, pp. 8-9; doc. no. 142-1, p. 3). However, the PLRA does allow Plaintiff to recover nominal damages for Defendants' Establishment Clause violation. Id.

Accordingly, the Court awards Plaintiff nominal damages in the sum of $1.00. See Quainoo v. City of Huntsville, Ala., 611 F. App'x 953, 955 (11th Cir. 2015) (defining nominal damages as $1 or $100); Jones v. Crew Distrib. Co., 984 F.2d 405, 407-09 (11th Cir. 1993) (describing damages of $1 as nominal); see also Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277, 1291 (11th Cir. 2014) (defining "'nominal damages' as '[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated'") (quoting Black's Law Dictionary 447 (9th ed. 2009)).

### III. CONCLUSION

For the reasons set forth above, the Court finds Defendants CCA and Phillips violated Plaintiff's rights under the Establishment Clause and awards Plaintiff $1.00 in nominal damages against those Defendants. The Court finds Defendants Day, Medlin, and Hininger did not violate Plaintiff's rights under the Establishment Clause, and none of Defendants violated Plaintiff's rights under RLUIPA. Accordingly, Defendants are entitled to judgment on those claims. Plaintiff's claims for injunctive relief are moot. (See doc. no. 108, pp. 7-8.)

The Court **DIRECTS** the Clerk to enter judgment in accordance with this Order.

SO ORDERED this 5th day of December, 2017, at Augusta, Georgia.

*/s/ Brian K. Epps*
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA